IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

VICKY LOUISE COOPER,
Personal Representative of the Estate
of Michael Wesley Cooper, Deceased,
et al.,

              Plaintiffs,                             Civil Action

              v.                             Case No. 07-2434-GLR

JOHN M. CICCARELLI, M.D.,
et al.,

              Defendants.

**MEMORANDUM AND ORDER**

Plaintiff Vicky Cooper, individually and as personal representative of the estate of her husband Michael Cooper, deceased, brings this action against John M. Ciccarelli, M.D., Spinal Institute of Kansas City, P.A., Jason Randall, Daniel Mitchell, M.D., Edward Robertson, M.D., Antoinette Quinn, R.N., Mark S. Reinsel, M.D., and Shawnee Mission Medical Center, Inc.  Her amended complaint asserts claims for damages for alleged negligence under the Kansas wrongful death statute, K.S.A. 60-1901 *et seq*., and the Kansas survival statute, K.S.A. 60-1801 *et seq*.  All parties have consented to the exercise of jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

The  matter comes before the Court on Defendant Jason Randall P.A.'s Motion for Summary Judgment and Defendant Spinal Institute of Kansas City, P.A.'s Motion for Partial Summary Judgment (doc. 60). These Defendants seek summary judgment for lack of expert testimony because Plaintiff has not designated an expert witness to testify about the standard of care required of

1

defendant Randall as a physician's assistant.  The law of the state of Kansas governs these issues.

I.      **Facts**

The following facts are undisputed: Defendant Dr. Ciccarelli is a physician specializing in orthopedic surgery.  Defendant Randall is a physician's assistant, licensed to practice in the state of Kansas.  At all material times he was an employee of Defendant Spinal Institute of Kansas City, P.A. ("Spinal Institute").  Dr. Ciccarelli ordered an x-ray of the decedent, which was taken on November 30, 2005.   The Radiology Exam Report of the x-ray stated in part: "Non-calcified pulmonary parenchymal nodule, right mid lung . . . .  Tumor cannot be excluded."

Defendants allegedly failed to inform the patient Michael Cooper of this reported finding. Plaintiff contends that, as a result of this alleged negligence of Defendants, her husband Michael Cooper "did not know for over a year" he was suffering from lung cancer.  Plaintiffs' Fifth Amended Complaint alleges the following negligence as to Defendant Randall:

> Randall in his care and treatment of Michael Wesley Cooper and in the discharge of his duties as a physician's assistant, was negligent and careless and failed to use such care as a reasonably prudent and careful health care provider would have under the same or similar circumstances in that, while the November 30, 2005 Radiology Exam Report contained findings of "Non-calcified pulmonary parenchymal nodule, right mid lung. Tumor cannot be excluded", Randall, after receiving and reviewing the Radiology Exam Report in December, 2005, failed to notify Michael Wesley Cooper or Ciccarelli of such findings.[1]

Plaintiff alleges that Defendant Spinal Institute is vicariously liable for the alleged negligence of Defendants Ciccarelli and Randall.

Pursuant to Fed. R. Civ. P 26(a)(2), Plaintiff designated two medical experts: Barry L. Singer, M.D., a specialist in internal medicine, oncology, and hematology; and Ronald A. Ripps,

---

[1]Fifth Am. Compl. (doc. 84) ¶ 44.

M.D., a specialist in orthopedic medicine. The disclosure for Dr. Singer indicates he was retained to review the facts and provide his opinion as to damages and injuries of Plaintiff. It states that Dr. Singer will testify on matters set forth in his May 19, 2008 report. That report offers neither opinion nor criticism with regard to the care provided by Defendant Randall. It offers no opinion about the standard of care applicable to any defendant.

The disclosure for Ronald Ripps, M.D., states that Dr. Ripps was retained to review the facts and render an opinion as to whether "Dr. Ciccarelli, in his care and treatment of Plaintiff, failed to exercise that degree of skill and learning ordinarily employed by members of his profession under the same or similar circumstances."[2] The disclosure further states Dr. Ripps will testify on matters set forth in his June 13, 2008, report. That report also offers neither opinion nor criticism with regard to the care provided by Defendant Randall. The opinions expressed by Dr. Ripps concern only the standard of care applicable to Dr. Ciccarelli. But none as to the standard of care applicable to a physician's assistant. The report of Dr. Ripps states: "By neither reporting the chest x-ray findings of 11/30/05 to Mr. Cooper, nor following up on the radiologist's admonition that, 'Tumor cannot be excluded,' Dr. Ciccarelli violated the standard of care."[3] Dr. Ripps further states that Dr. Ciccarelli "failed to do what any reasonable and prudent orthopedic surgeon would have done under similar circumstances."[4] Dr. Ripps opines that:

> There is an axiom in medicine that he who orders a test owns the test. That means he who orders a test is responsible for the results. Since Dr. Ciccarelli ordered the chest x-ray, the results of said chest x-ray are his and his alone to act upon. Delegating preoperative clearance to his physician assistant or other office personnel

---

[2]Ex. C to Defs.' Mem. in Supp. of Mot. for Summ. J. (doc. 61-4).

[3]Ex. E to Defs.' Mem. in Supp. of Mot. for Summ. J. (doc. 61-6).

[4]*Id.*

does not absolve Dr. Ciccarelli of that responsibility.[5]

Thus neither expert witnesses identified by Plaintiff offers an opinion as to whether Defendant Randall violated any standard of care, or as a physician's assistant caused, or contributed to the alleged injuries and damages of Plaintiff.  Defendants further argue that neither expert witness offers an opinion that Defendant Spinal Institute departed from the accepted standard of care.

## II.   Standard for Summary Judgment

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue regarding any material fact and that the moving party is entitled to judgment as a matter of law.[6]   In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[7]   A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[8]   An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[9]

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[10]   In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other

---

[5]*Id.*

[6]Fed. R. Civ. P. 56(c).

[7]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002).

[8]*Wright ex rel. Trust Co. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[9]*Adler*, 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[10]*Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[11]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[12]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[13]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[14]  To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein.[15]

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"[16]

## III.   Whether Testimony by an Expert Witness is Required to Establish the Standard of Care for Defendant Randall

The two moving Defendants argue that the failure of Plaintiff to provide expert testimony on the standard of care required of Randall as a physician's assistant defeats the claims as to them.

---

[11]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671).

[12] *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see also Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324.

[13]*Anderson*, 477 U.S. at 256; *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[14]*Mitchell v. City of Moore, Okla.,*, 218 F.3d 1190, 1197 (10th Cir. 2000).

[15]*Id.*

[16]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

Plaintiff does not dispute the lack of expert testimony as to Randall. She argues instead that the alleged negligence of Randall, by signing off on the Radiology Report without telling anyone about its contents, falls within the "common knowledge" exception to the requirement for expert testimony.

A claim of medical malpractice requires proof of four elements: (1) existence of a duty; (2) breach of that duty; (3) injury; and (4) a causal connection between the duty breached and the injury suffered.[17] In medical malpractice cases, expert testimony is ordinarily required to establish the applicable standard of care and to prove causation.[18] However, "this rule does not give members of the medical profession a monopoly on common sense" and is "limited to matters clearly within the domain of medical science."[19] This "common knowledge" exception applies "if what is alleged to have occurred in the diagnosis, treatment and care of a patient is so obviously lacking in reasonable care and the results are so bad that the lack of reasonable care would be apparent to and within the common knowledge and experience of mankind generally."[20]

But the "common knowledge" exception is extremely limited.[21] Courts applying Kansas law have generally only applied the exception in cases of *obvious* breaches of reasonable care that an average person could immediately identify and the results of which are readily apparent, e.g. a

---

[17]*Watkins v. McAllister*, 30 Kan. App. 2d 1255, 1258, 59 P.3d 1021, 1023 (2002) (citing *Schmidt v. Shearer*, 26 Kan. App. 2d 760, 764, 995 P.2d 381, 386 (1999)).

[18]*Id.*

[19]*Webb v. Lungstrum*, 223 Kan. 487, 490, 575 P.2d 22 (1978).

[20]*Id.*

[21] *Perkins v. Susan B. Allen Mem'l Hosp.*, 36 Kan. App. 2d 885, 889, 146 P.3d 1102, 1106 (2006).

sponge left in a person's body causes infection, a weakened patient's tilted bed will result in a fall, a patient whose condition is worsening will continue to worsen when the nurse only makes one attempt to call a doctor.[22]

In *Karrigan v. Nazareth Convent & Academy, Inc.,*[23] a patient was recovering from a successful gallstone surgery when his doctor removed a final drainage tube.  When the patient complained of severe pain and the nurses were unable to reach the treating physician, they contacted another doctor and got an order for pain medication.  During the next ten and a half hours the nurses on duty made no further effort to secure medical attention despite the fact the patient repeatedly complained of severe pain, made repeated requests for a doctor, became apprehensive of death and asked for a priest.  When the doctor returned, the patient was in critical condition.  The court applied the common-knowledge exception by concluding that even a layman might justifiably find the effort of the nurses inadequate, given the patient's severe pain and concern that he might die.[24]  The court reasoned that "it does not seem necessary to require expert testimony to establish that a hospital exercising ordinary skill, care and diligence would have secured a doctor at [the patient's]

---

[22]*See McKnight v. St. Francis Hosp. & Sch. of Nursing, Inc.,* 224 Kan. 632, 633-34, 585 P.2d 984, 986 (1978) (applying exception when weakened patient fell onto the floor during an x-ray examination when the table was tilted vertically); *Karrigan v. Nazareth Convent & Acad., Inc.*, 212 Kan. 44, 51, 510 P.2d 190, 196 (1973) (applying exception when nursing staff failed to attempt to contact doctor after initial attempt); *Rule v. Cheeseman,* 181 Kan. 957, 963, 317 P.2d 472, 477 (1957) (applying exception when sponge was left in patient after surgery); *Bernsden v. Johnson*, 174 Kan. 230, 236-38, 255 P.2d 1033, 1038-39 (1953) (applying exception when post-surgery choking was caused by metal disc lodged in patient's throat);  *Schwartz v. Abay*, 26 Kan. App. 2d 707, 995 P.2d 878, 881 (1999) (applying exception where surgeon removed 60% of the wrong vertebral disc).

[23]212 Kan. 44, 51, 510 P.2d 190, 196 (1973).

[24]*Karrigan*, 212 Kan. at 51, 510 P.2d at 196.

bedside."[25]

On the other hand, Kansas courts have generally declined to apply the exception, even in close cases, when the care at issue could reasonably be said to have required any level of medical knowledge or discretion.[26] In *Treaster v. HealthSouth Corp.*,[27] a patient who had previously suffered a severe brain injury that resulted in confusion, agitation and restlessness fell from his hospital bed and broke his hip. The patient's physician had not restrained him to his bed despite the patient's unstable behavior and high risk for falls, but instead took other, less restrictive precautions. The court declined to apply the common knowledge exception because it found the decision to restrain a patient is a technical medical question and a complex determination.[28] The court noted that the physician had been "confronted with the arguably competing interests of ensuring plaintiff's safety

---

[25]*Id.*

[26]*See Treaster v. HealthSouth Corp.*, 442 F. Supp. 2d 1171, 1180-81 (D. Kan. 2006) (exception inapplicable when patient recovering from brain injury fell from bed because physician confronted with the competing interests of ensuring patient's safety while providing an environment which would improve chances of rehabilitation); *Cunningham v. Riverside Health Sys., Inc.*, 33 Kan. App. 2d 1, 6-8, 99 P.3d 133, 137 (2004) (exception inapplicable to nursing assistant's act of pulling on osteoporotic's leg while transferring patient to bed after knee surgery despite evidence that post-surgery x-ray did not show fracture and that patient heard "crack"); *Savina v. Sterling Drug, Inc.,* 247 Kan. 105, 135-36, 795 P.2d 915, 936 (1990) (administration of a spinal tap is a complicated, delicate procedure that lies beyond the realm of common knowledge and experience of a layman); *Bacon v. Mercy Hosp. of Ft. Scott*, 243 Kan. 303, 308, 756 P.2d 416, 420 (1988) (the etiology of cerebral palsy is beyond the experience and knowledge of a lay jury); *Collins v. Meeker*, 198 Kan. 390, 399, 424 P.2d 488, 496 (1967) (hernia operation is too complex and technical to permit jury to speculate on the adequacy and skillfulness of its performance); *Crooks v. Greene*, 12 Kan. App. 2d 62, 66-67, 736 P.2d 78, 81-82 (1987) (cerebral damage resulting from physician prescribing Valium to alcoholic patient could not be determined without expert testimony); *Crowley v. O'Neil*, 4 Kan. App. 2d 491, 496-97, 609 P.2d 198, 203 (1980) (cholecystectomy procedure not within the common knowledge generally held by lay persons).

[27]442 F. Supp. 2d 1171, 1180 (D. Kan. 2006).

[28]*Treaster*, 442 F. Supp. 2d at 1181.

while simultaneously providing an environment which would improve his changes of rehabilitation."[29]  As a result, the court concluded that the facts were sufficiently complex that the common knowledge exception did not apply.

The parties here present a close question as to whether the "common knowledge" exception applies to judge the conduct of Defendant Randall.  In deciding it, the Court assumes that a lay jury could reasonably conclude that x-ray reports generally contain findings important to the patient and useful to the treating physician.  It assumes that a lay jury could also understand the phrase a "tumor cannot be excluded" to be sufficiently important to note.  It concedes that a lay jury would not necessarily be able to equate "tumor" with cancer, but could nevertheless find it to be an abnormal condition of the body and  that a physician's assistant, charged to look at and initial the report, would be expected to take note of it.  It assumes that a lay jury could also find that a treating physician would be interested to know such a finding.  With these assumptions the question narrows to whether a person in the role of a physician's assistant and possessed with the reported information could be found negligent for failing to alert to his supervising physician, whether or not any standard of medical care required it.  In other words, does this simply pose a question of common sense as to how an assistant to a physician, working together for the benefit of the patient, should communicate information which could be important to his welfare.

Defendants argue that the average person would not know whether the radiology findings were of medical significance, what action should then be taken, what treatment options were available, whether the radiology findings revealed a malignancy or some other disease process, or whether the result of delayed diagnosis meant the decedent lost a substantial chance for better

_____

[29]*Id.* at 1180.

recovery.  The Court does not dispute the complexities of diagnosis and treatment of tumors that an average person would not readily understand.  But the question before it is not whether Defendant Randall himself understood those complexities.  The issue instead addresses whether or not he may have been negligent, after receiving and initialing the report, for failing to alert Dr. Ciccarelli of its finding that a "tumor cannot be excluded."  Does the report thus provide sufficient information to allow a lay jury to conclude that an ordinary person, exercising due care as an assistant, should have alerted his supervising surgeon?

Construing the evidence most favorably to Plaintiff suggests that Defendant Randall, a physician's assistant, received and initialed the report.  It suggested the possibility of a tumor.  The Court can assume it was outside Randall's area of expertise to determine if this was a significant medical finding.  In contrast to *Treaster*, however, there is no indication that Randall and Dr. Ciccarelli were under any "arguably competing interests" in their care of the decedent.  Their mutual concern was to safeguard the decedent's health.  Though this case is not as clear as *Kerrigan*, it bears some comparison.  Failure to summon a doctor to a patient complaining of severe pain could logically lead to a deteriorating condition.  Similarly the failure by an assistant to alert a supervising physician to a radiology report that suggests the possibility of a tumor could foreseeably result in an adverse consequence for the patient.

Defendants dispute that Defendant Randall saw and initialed the report.  Reviewing the evidence in a light most favorable to Plaintiff, however, as it must, the Court at this point relies upon the testimony of Dr. Ciccarelli to indicate that Randall received and initialed the report.  Defendants have attached portions of the transcript of his deposition as an exhibit to their reply memorandum.  It includes the following testimony:

Q.      The first meeting that you had with Jason Randall where you described what you expected of him, as your physician's assistant, you said took place over the course of several days and it was at the medical office; correct?

A.      Yes.

Q.      What did you say to him and what did he say to you during the course of this meeting that took place over several days?

A.      . . . I would also have included procedures on reviewing diagnostic studies or lab studies that were ordered and that any abnormalities or incidental abnormalities that would have been discovered, to notify me and that we could follow up on that appropriately; it would have been discussions such as that.

Q.      Okay.  So, you would expect your physician's assistant to look at, for instance, preoperative chest x-rays?

A.      Not necessarily.  I wouldn't expect them necessarily to actually review the chest x-ray film, but there was a system in our - in place at the office of Spinal Institute where we actually, to my recollection, had a box or a file that had "to be reviewed" label on it and all diagnostic studies that were ordered by the physicians out of that practice would end up there to be reviewed, on a daily basis, by the physician assistants and to essentially reviewed those studies, sign off on those and if there were any issues or concerns, to discuss it with the appropriate physician.

Q.      Okay.  Let's break that down a little bit.  You say that there was a policy and procedure in place for physicians' assistants to review radiology reports; correct?

A.      That would have been one piece; yes.

                        *        *        *

Q.      Did you ever discipline any physician's assistant or any other staff when you came to realize, if you did, that this policy or procedure was not followed?

A.      I don't recall any episodes where a discipline action had to be taken.  It was a system that was in place that, in my experience, worked very well with the physicians and the physicians' assistants.

Q.      How do you know it worked well?

A.      It was a situation where the general mechanism of this method to be in place

11

was done and reviewed and physicians' assistants that worked with me specifically knew that I wanted to be made aware of any potential abnormalities, even incidental findings that they would come across in reviewing some of these diagnostic studies that would get ordered.

*       *       *

Q.      Do you know, in this case, do you think that Jason Randall did something wrong or was somehow negligent or careless in his handling of this radiology report?

A.      Yes.

Q.      What do you believe?

A.      I believe this is just signed off and was not brought to my attention, which was the system and the expectation that was in place, that has been in place and continued to be in place . . .

*       *       *

Q.      Well, you said earlier that the system worked.  How do you know that other cancers or potential cancers fell through the cracks, if you didn't go back and do a thorough review of all the chest x-rays?

A.      Well, there have been numerous occasions where P.A.'s that have worked with me and do work with me have pointed out these potential abnormalities and that we have followed up on and that's a fairly consistent situation that occurs.

*       *       *

Q.      We know that it's your position that Jason Randall ought to have looked at the radiology report that was done as a result of the November 30th, 2005 chest x-ray; correct?

A.      Yes.

Q.      It's your belief that he did look at it; correct?

A.      Yes.

Q.      You believe that because you that there is a document that shows he has initialed it?

12

A.      Yes.[30]

Defendants dispute this evidence.  But a jury could nevertheless infer from it, independent of any medical standard, that in the course of his employment Defendant Randall received sufficient instruction from his employer to require him to alert Dr. Ciccarelli of the content of an x-ray report showing the possibility of a tumor.

With the foregoing analysis the Court finds that a jury could determine that Defendant Randall violated a standard of ordinary due care within the meaning of the "common knowledge" exception, recognized by the law of Kansas.  Indeed, the Kansas decisions seem to stand for the simple proposition that a health care provider, like anyone else, can be ordinarily negligent, whether or not he has also violated a medical standard of care.  As noted from *Webb,*[31] the applicable rule does not give members of the medical profession a monopoly on common sense.  As a correlative, one might say that a health care provider does not possess an immunity against the duty of ordinary due care in his work.

For the foregoing reasons the Court denies the motions for summary judgment.  This ruling does not mean that Plaintiff has met her burden to prove the elements of the asserted claims.  The Court merely holds that the claims in question should not be summarily adjudicated for lack of expert testimony to establish a standard of care as to Defendant Randall.  His negligence, if any, remains for the jury to determine.

        **IT IS THEREFORE ORDERED** that Defendant Jason Randall P.A.'s Motion for Summary

---

[30]Ciccarelli Dep. 21:12-20, 22:6-25, 23:1-9, 22-25, 24:1-14, 43:12-22, 44:6-15, 25, 45:1-10, June 4, 2008.

[31]223 Kan. at 490, 575 P.2d at 25.

Judgment and Defendant Spinal Institute of Kansas City, P.A.'s Motion for Partial Summary

Judgment (doc. 60) is denied.

      Dated this 4th day of March, 2009, in Kansas City, Kansas.

                                  s/ Gerald L. Rushfelt
                                  Gerald L. Rushfelt
                                  U. S. MAGISTRATE JUDGE

cc:    All counsel